MICHAEL, Circuit Judge,
dissenting:
The majority’s decision to uphold the Virginia abortion ban challenged here (the Virginia Act) marks an alarming departure *184 from settled Supreme Court precedent: it sanctions an unconstitutional burden on a woman’s right to choose. Gonzales v. Carhart (Carhart II), 550 U.S. 124, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007), and longstanding precedent explicitly reaffirmed in that case hold that the Constitution protects a woman’s right to choose the standard dilation and evacuation (D & E) procedure employed in the vast majority of pre-viability second trimester abortions. The Virginia Act violates the Constitution because it exposes all doctors who perform the standard D & E to prosecution, conviction, and punishment. The Act does this by imposing criminal liability on any doctor who sets out to perform a standard D & E that by accident becomes an intact D & E.
The Supreme Court in Carhart II considered a facial challenge to the federal criminal statute that prohibits the intact D & E procedure. The Court upheld the federal statute based on its requirement that a doctor intend at the outset to perform an intact D & E. This intent requirement, the Carhart II Comet emphasized, precludes liability from attaching to an accidental intact D & E. Carhart II thus affords constitutional protection to a doctor whose intent at the outset is to perform a standard D & E, even when the doctor must complete the abortion by performing an intact D & E. This doctor, in other words, is shielded from criminal liability under the Federal Act. The Virginia Act provides a doctor with no such protection.
The majority itself concedes that “the Virginia Act is broader in scope than the federal statute, covering accidental intact D & Es.” Ante at 177. The majority, however, claims that the Virginia Act is nonetheless constitutional because it provides a doctor with “affirmative defenses” that purportedly could be used to argue for jury acquittal in a criminal trial. As I will explain, those hollow “defenses” do not offer doctors who set out to perform constitutionally protected standard D & Es any realistic or reliable option. No doctor would be foolish enough to take the treacherous path suggested by the majority, for it would almost certainly lead to the commission of a crime under the Virginia Act. Because of the real fear of criminal liability, doctors in Virginia will stop performing standard D & Es altogether. This result places an undue burden on a woman’s right to obtain a pre-viability second trimester abortion—a constitutional right repeatedly reaffirmed by the Supreme Court.
For similar reasons, the majority is wrong when it says that no facial challenge lies in this case because the accidental intact D & E does not occur with sufficient frequency. The majority overlooks the fact that the Virginia Act subjects a doctor to the risk of criminal liability every time he sets out to perform a standard D & E. This risk is real, as the Supreme Court recognized in Carhart II. And because this risk is present during every standard D & E, facial invalidation of the Virginia Act is required.
I respectfully dissent.[1]
I.
A.
The Virginia Act criminalizes “partial birth infanticide,” a new, non-medical term chosen by the legislature. Va.Code Ann. § 18.2-71.1(A). This crime occurs when (1) a fetus “has been ... substantially expelled or extracted from its mother” *185 (that is, has emerged to an anatomical landmark) and exhibits “evidence of life,” (2) thereafter, but before the fetus is “completely extracted or expelled,” a person “knowingly performs” “any deliberate act that ... is intended to kill” the fetus, and (3) the deliberate act “does kill” the fetus, “regardless of whether death occurs before or after extraction or expulsion.” Id. § 18.2-71.1(A)-(D). Anatomical landmarks (trunk past the navel in breech presentation or fetal head “outside the body of the mother” in head-first presentation) establish the point at which the Act applies.[2] Id. § 18.2-71.1(D). Partial birth infanticide is a class four felony that is punishable by a prison term of up to ten years and a fine of up to $100,000. Id. §§ 18.2.71.1, 18.2-10(d). The Act does not include an exception to preserve a woman’s health, but it does have a “prevention of death” exception. Id. § 18.2-71.1(E).
B.
Plaintiff William G. Fitzhugh, M.D., is a board certified obstetrician and gynecologist who is licensed to practice medicine in Virginia. Dr. Fitzhugh performs only previability abortions, through twenty weeks of pregnancy. He performs some abortions on the premises of plaintiff Richmond Medical Center for Women. For second trimester abortions, Dr. Fitzhugh usually employs the standard D & E method.
Dr. Fitzhugh explains that his patients who seek second trimester abortions “do so for a variety of reasons”:
Some women have pregnancies complicated by severe or fatal fetal anomalies diagnosed in the second trimester; some are pregnant as a result of rape, incest or failed contraception; some are in need of abortion services to protect their health and lives; some are unaware of their menstrual cycle or have irregular menstrual cycles; and some of the very young are unaware of or dismiss the possibility of pregnancy. Some have delayed obtaining an abortion for a wide range of other personal reasons.
Fully one-third of the 225 second trimester abortions Dr. Fitzhugh performs “are because of a genetic abnormality to the fetus, a bad condition of the fetus, or a medical condition of the woman.”
Dr. Fitzhugh asserts that the Virginia Act exposes a doctor to criminal liability every time he attempts a D & E abortion because the procedure always poses the risk of unintentional intact delivery of the fetus to one of the anatomical landmarks specified in the Act. The district court agreed with Dr. Fitzhugh, holding that the Virginia Act is unconstitutional because (among other things) it imposes an undue burden on a woman’s right to choose an abortion for the following reason: “The plain language of the Act bans pre-viability D & Es and would cause those who perform such D & Es to fear prosecution, conviction and imprisonment.” Richmond Med. Ctr. for Women v. Hicks, 301 F.Supp.2d 499, 515 (E.D.Va.2004).
II.
Because the majority is reversing the award of summary judgment to Dr. Fitzhugh and directing the entry of judgment in favor of the Commonwealth of Virginia, Dr. Fitzhugh’s evidence “is to be believed, and all justifiable inferences are to be drawn in his favor.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
The D & E procedure is by far the most common method of pre-viability second trimester abortion, used in approximately ninety-five percent of cases. In this proce *186 dure the doctor dilates the woman’s cervix and uses suction and forceps to remove the fetus. The doctor also uses instruments to hold the vagina open and to gain access to the cervix and uterus. As the doctor uses forceps to pull the fetus out of the cervix during a D & E, friction usually causes parts of the fetus to break off or disarticulate. As a result of disarticulation the fetus is removed in pieces.[3] Throughout the process, the fetus may show signs of life, such as a heartbeat, although disarticulation ultimately causes fetal demise.
A variation of the standard D & E procedure, often termed “intact D & E,” occurs when the doctor removes the fetus intact or largely intact. A doctor intending to perform an intact D & E uses certain methods, such as serially dilating the cervix or rotating the fetus as it is pulled out of the uterus, to increase the likelihood of intact delivery. In an intact D & E the fetal skull is typically too large to pass through the cervix, and the doctor compresses or collapses the skull to complete the abortion.
As the Supreme Court has recognized— and the undisputed record in this case establishes—a doctor performing standard D & Es will, in a small fraction of cases, unintentionally (or accidentally) deliver the fetus intact to or past an anatomical landmark. See Carhart II, 550 U.S. at 155, 127 S.Ct. 1610. The potential is always present for an accidental intact delivery to an anatomical landmark during a standard D & E because a doctor cannot predict at the outset of the procedure when, or even whether, a fetus will disarticulate during evacuation. Fetal disarticulation is influenced by several factors beyond the doctor’s control, including the precise level of cervical dilation, the condition of the uterus and the cervix, the size and orientation of the fetus, and fetal fragility. While the fetus usually disarticulates as it is pulled through the cervix, on occasion the factors just noted may cause it to emerge intact or substantially intact. Dr. Fitzhugh does not intentionally perform intact D & Es; however, when he performs standard D & Es, a small fraction of those cases result in intact extraction of the fetus to an anatomical landmark prior to completion of the abortion.
Once a fetus emerges to an anatomical landmark despite the doctor’s intent to perform a standard D & E, steps must be taken to complete the abortion. Thus, in a breech presentation, after the fetus emerges to the navel (an anatomical landmark), the doctor will continue to pull to extract the fetus. This force and traction usually causes the fetus to disarticulate, leading to its demise. In addition, the fetal skull can become lodged in the cervix without disarticulation, as it would in an intentional intact D & E. In this situation the doctor will have to compress or collapse the fetal skull to remove it through the cervix and complete the abortion, another act that causes fetal demise.
Dr. Fitzhugh explained in detail why he would be in constant risk of violating the Virginia Act in his practice. First, “about one, two, three [times] a year,” or “[l]ess than a half’ percent of the time, the fetus (in breech position) is removed intact with the neck lodged in the cervix. At this point, the fetus is outside of the woman’s body to the navel or beyond, and Dr. Fitzhugh must compress or collapse the skull to complete the abortion. Second, about ten percent of the time the fetus (in breech position) emerges from the cervix intact to the navel or beyond, but the neck has not reached the cervical opening.[4] In this sit *187 uation Dr. Fitzhugh continues to pull on the fetus, and it usually disarticulates. Of this ten percent category of cases, there is a small percentage in which the fetus up to the navel has emerged from the vaginal opening (outside of the woman’s body). Although Dr. Fitzhugh did not estimate the number or percentage of times he is confronted with such an unintentional intact emergence to the navel, he emphasized that the action he takes at that point to complete the abortion—action that occurs outside of the woman’s body—usually results in fetal disarticulation and demise.
In sum, when a doctor is faced with the accidental situation of the intact extraction of the fetus to an anatomical landmark, he has no realistic option short of completing the abortion in a manner that causes fetal demise. See Carhart II, 550 U.S. at 154, 127 S.Ct. 1610 (To complete an accidental intact D & E, the “doctor[ ] will commit an overt act that kills the partially delivered fetus.”)
III.
The Supreme Court has instructed us to assess the Virginia Act in light of Carhart II. There, the Court based its decision to uphold the federal statute on the statute’s requirement that the crime of partial birth abortion cannot occur unless the doctor intends at the outset of the procedure to perform an intact D & E. The majority readily acknowledges that the Virginia Act lacks this intent requirement, and it fails to muster an argument that saves the Act under Carhart II. Without the protection of the intent-at-the-outset requirement, the Virginia Act exposes a doctor who performs standard D & Es to criminal liability for an accidental intact D & E. As a result, a doctor’s only safe course is to stop performing standard D & Es altogether. This outcome imposes an undue burden on a woman’s right to obtain a standard D & E abortion in violation of the Constitution.
A.
In Carhart II the Court considered the constitutional limits on the regulation of abortion procedures and held that the federal Partial-Birth Abortion Ban Act of 2003 (the Federal Act), 18 U.S.C. § 1531, is constitutional “as a facial matter.” 550 U.S. at 168, 127 S.Ct. 1610. The Court began its analysis by quoting the summary of governing principles set forth in Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992):
“It must be stated at the outset and with clarity that [the] essential holding [of Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) ], the holding we reaffirm, has three parts. First is a recognition of the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State. Before viability, the State’s interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman’s effective right to elect the procedure. Second is a confirmation of the State’s power to restrict abortions after fetal viability, if the law contains exceptions for pregnancies which endanger the woman’s life or health. And third is the principle that the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life *188 of the fetus that may become a child. These principles do not contradict one another; and we adhere to each.”
Carhart II, 550 U.S. at 145, 127 S.Ct. 1610 (quoting Casey, 505 U.S. at 846, 112 S.Ct. 2791 (opinion of the Court)). In Carhart II the Court also adhered to Carhart Fs central holding: a law that effectively prohibits “[standard] D & E procedures, the most commonly used method for performing previability second trimester abortions,” imposes “an undue burden upon a woman’s right to make an abortion decision,” in violation of the Constitution. Carhart I, 530 U.S. 914, 945-46, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000); see Carhart II, 550 U.S. at 150-54, 127 S.Ct. 1610.
The Carhart II Court, after reviewing the text of the Federal Act, concluded that the statute “prohibits a doctor from intentionally performing an intact D & E,” but “does not prohibit the [standard] D & E procedure in which the fetus is removed in parts.” Carhart II, 550 U.S. at 150, 127 S.Ct. 1610. The Court’s constitutional analysis proceeded as follows. First, the Court considered whether the Federal Act was void for vagueness or overly broad. Here, the Court was guided by the Federal Act’s “definition of] the unlawful abortion in explicit terms.” Id. at 147, 127 S.Ct. 1610. Specifically, to violate the Federal Act, a doctor must (1) vaginally deliver a living fetus; (2) deliver the fetus to a clearly described anatomical landmark (trunk past the navel in a breech presentation or entire head outside in a head-first presentation); and (3) perform a distinct “ ‘overt act, [an act] other than completion of delivery, that kills the partially delivered living fetus.’” (quoting 18 U.S.C. § 1531(b)(1)(B)). Id. at 147-48, 127 S.Ct. 1610. The Court emphasized that the Federal Act contains intent requirements “concerning all the actions involved in the prohibited abortion.” Id. at 148, 127 S.Ct. 1610. Thus, the Federal Act requires that the doctor (1) “deliberately and intentionally” deliver the fetus to a specific anatomical landmark (2) “for the purpose of performing an overt act that the [doctor] knows will kill [it].” Id. (quoting 18 U.S.C. § 1531(b)(1)(A)) (alteration in original). Through this precise definition the Federal Act makes it a crime for a doctor to intentionally set out to perform and then to perform an intact D & E abortion.
In rejecting the vagueness challenge, the Court concluded that the Federal Act’s intent requirements provide doctors with a clear description of the prohibited conduct and prosecutors with objective criteria that serve to limit their discretion. 550 U.S. at 148-150, 127 S.Ct. 1610. The Court then concluded that the Federal Act was not overly broad because it only “prohibits a doctor from intentionally performing an intact D & E.” Id. at 150, 127 S.Ct. 1610. Again, the Court found that the Federal Act’s reach was limited by the features of the unlawful abortion enumerated above. Id. at 150-56, 127 S.Ct. 1610. Specifically, the Federal Act’s “intent requirements ... preclude liability from attaching to an accidental intact D & E.” Id. at 155, 127 S.Ct. 1610. Thus, a doctor never runs the risk of violating the Federal Act when he sets out to perform a standard D & E, even though the fetus might be delivered to one of the anatomical landmarks “by accident or inadvertence.” Id. at 148, 127 S.Ct. 1610. As a result, the scope of the Federal Act is carefully limited to prohibit intentional intact D & E, thereby allowing access to the more widely used standard D & E procedure. Id. at 150-56, 127 S.Ct. 1610.
Second, the Court considered whether the Federal Act was passed with the impermissible purpose of placing “ ‘a substantial obstacle in the path of a woman seeking an abortion before the fetus at *189 tains viability.’ ” Id. at 156, 127 S.Ct. 1610 (quoting Casey, 505 U.S. at 878, 112 S.Ct. 2791 (plurality opinion)). The Court determined that Congress, in carefully targeting its restriction to the intact D & E, was engaging in a legitimate use of its authority to “regulat[e] the medical profession in order to promote respect for life, including life of the unborn.” Id. at 158, 127 S.Ct. 1610.
Third, the Court considered whether the Federal Act imposed a substantial obstacle to late-term, pre-viability abortions by failing to include an exception to preserve the health of the woman. Id. at 161-67, 127 S.Ct. 1610. The Federal Act contains a life exception, 18 U.S.C. § 1531(a), but not a health exception. The Court noted that “whether the Act creates significant health risks for women [was] a contested factual question.” Id. at 161, 127 S.Ct. 1610. As a result, the Court held, “[t]he [Federal] Act is not invalid on its face” for lack of a health exception because “there is uncertainty over whether the barred procedure is ever necessary to preserve a woman’s health, given the availability of other abortion procedures,” such as the standard D & E, “that are considered to be safe alternatives.” Id. at 167, 127 S.Ct. 1610. In the face of this medical uncertainty, only as-applied challenges to the Federal Act’s lack of a health exception may be pursued. Id. at 167-68,127 S.Ct. 1610.
When the Virginia Act is measured against Carhart II and is compared to the materially different Federal Act, it becomes clear that the Virginia Act effectively prohibits the (pre-viability) standard D & E procedure, in violation of the Constitution.
B.
To repeat, the Virginia crime of “partial birth infanticide” occurs when (1) a fetus “has been ... substantially expelled or extracted from its mother” (that is, has emerged to an anatomical landmark) and exhibits “evidence of life,” (2) thereafter, but before the fetus is “completely extracted or expelled,” a person “knowingly performs” “any deliberate act that ... is intended to kill” the fetus, and (3) the deliberate act “does kill” the fetus, “regardless of whether death occurs before or after extraction or expulsion.” Va.Code Ann. § 18.2-71.1(A)(D). The Virginia Act specifies anatomical landmarks (the trunk past the navel or the fetal head “outside the body of the mother”) that establish the point at which the Act applies. Id. § 18.2-71.1(D). The Federal Act uses the same anatomical landmarks. 18 U.S.C. § 1531(b)(1)(A).
The Virginia Act lacks the intent and distinct overt act requirements that were central to the Supreme Court’s decision to uphold the Federal Act in Carhart II. Indeed, the Virginia General Assembly intentionally omitted these requirements from the final version of the Virginia Act. As originally introduced in the House of Delegates, House Bill No. 1541 contained both an intentional delivery requirement and a distinct overt act requirement that used precisely the same language as the Federal Act. Compare H.B. 1541, 2003 Leg. Reg. Sess. (Va.2003) (Introduced), available at http://legl.state.va.us/cgi-binfiegp504.exe? 031 + ful+HB1541+pdf with 18 U.S.C.S. § 1531(b)(1). By the time the legislative process was complete, however, the General Assembly had rejected the intentional delivery and distinct overt act requirements and had opted instead for the language in the current Act. See H.B. 1541-H2, 2003 Leg., Reg. Sess. (Va.2003) (House Substitute), available at http:/fiegl. state.va.us/cgi-binfiegp504 exe ?031+ful+HB1541H2+pdf; Va.Code Ann. § 18.2-71.1. Through this process the legislature demonstrated its intent that the *190 Virginia Act criminalize accidental intact D & Es in which the act that causes fetal demise occurs simultaneously with completing the extraction. Specifically, the Virginia General Assembly chose to make it a crime when a doctor faces an accidental intact D & E and must perform a deliberate act (applying traction or compressing the skull) that causes fetal demise in order to complete the procedure. As a result, the Virginia Act, unlike the Federal Act, unconstitutionally subjects all doctors who perform standard D & Es to criminal liability. The key differences between the two statutes, discussed more fully below, confirm the broader, unconstitutional reach of the Virginia Act.
1.
As I have pointed out, the Federal Act “contains scienter requirements concerning all the actions involved in the prohibited abortion,” including both a requirement that the doctor intentionally deliver the fetus to an anatomical landmark and a requirement that this delivery be for the purpose of performing the overt act that the doctor knows will cause fetal demise. Carhart II, 550 U.S. at 148,127 S.Ct. 1610; see 18 U.S.C. § 1531(b)(1)(A). As the Supreme Court observed, under the Federal Act “[i]f either intent is absent, no crime has occurred.” Carhart II, 550 U.S. at 148, 127 S.Ct. 1610. These intent requirements were crucial to Carhart II’s holding that the Federal Act does not prohibit the standard D & E and is thus constitutional. Id. at 150, 127 S.Ct. 1610. As the Court explained, “[t]he Act’s intent requirements ... limit its reach to those physicians who carry out the intact D & E after intending to undertake both [the delivery to an anatomical landmark and the distinct overt act] steps at the outset.” Id. at 151, 127 S.Ct. 1610. The Court rejected the argument that the Federal Act imposes criminal liability on doctors who complete an abortion after accidental intact delivery to an anatomical landmark. This argument, the Court said, failed to “take account of the Act’s intent requirements, which preclude liability from attaching to an accidental intact D & E.” Id. at 155, 127 S.Ct. 1610.
The Virginia Act lacks any such protection, as the majority acknowledges. Instead, the Act’s only intent requirement relates to the overt act: the doctor is prohibited from “knowingly performing] ... any deliberate act that ... is intended to kill [and does kill] a human infant who has been born alive, but who has not been completely extracted or expelled from its mother.” Va.Code Ann. § 18.2-71.1(A), (B) (emphasis added). In contrast to the Federal Act, the Virginia Act omits any mention of the doctor’s intent at the commencement of the procedure, using the phrase “has been born alive” to describe the delivery and identify the point at which any crime could begin. Thus, under the Virginia Act partial birth infanticide occurs only after delivery to an anatomical landmark, that is, after the infant “has been born alive.” The intent requirement does not attach to the commencement of the abortion, but rather to the subsequent deliberate act (the prohibited act) that results in fetal demise.
The majority agrees that the Virginia Act does not require intent at the outset and therefore applies to an accidental intact D & E. In the majority’s words,
The Virginia Act’s scienter is measured only after partial delivery of the “human infant who has been born alive” and not at the commencement of the abortion procedure, as under [the Federal Act].... [T]he doctor’s intent before commencing the D & E procedure is not determinative of scienter for purposes of criminal liability under the Virginia Act. The Virginia Act applies with equal *191 force to a doctor who intends to perform a prohibited intact D & E procedure, intentionally extracts the fetus past an anatomical landmark, and then performs a “deliberate act” to kill the fetus, and to a doctor who intends to perform a permissible standard D & E procedure, accidentally extracts the fetus past an anatomical landmark, and then performs a deliberate act to kill the fetus and complete the abortion. In either event, however, we read the Virginia Act intent requirement to require purpose, not mere knowledge, that a specific act— taken after emergence to the anatomical landmark-will result in fetal demise.[5] Thus, the Virginia Act criminalizes both the intentional intact D & E and the accidental intact D & E where the necessary scienter is present and no affirmative defense is presented.
Ante at 177 (emphasis in original) (citation omitted). The Virginia Act cannot survive the majority’s basic interpretation'—an interpretation I agree with—that the Act applies to an accidental intact D & E. The Virginia Act must fall under Carhart II, for a doctor faced with an accidental intact delivery to an anatomical landmark has no “affirmative defense.” He must either collapse the fetal skull, which causes fetal demise, or continue to pull (or apply traction), which usually causes disarticulation and fetal demise. In either case, he has committed a “deliberate act that ... is intended to kill” the fetus, thereby violating the Virginia Act. This doctor, confronted with an unintentional delivery to an anatomical landmark, does not have the option that saved the Federal Act, that is, the option to “complete[ ][the] abortion by performing an intact D & E” without violating the law. Carhart II, 550 U.S. at 155, 127 S.Ct. 1610. The option to complete the abortion is available under the Federal Act'because intent at the outset to perform an intact D & E is required. The Virginia Act’s failure to provide that central requirement is by itself sufficient to render the Act unconstitutional.
2.
There is a second key difference between the Virginia Act and the Federal Act. Although both statutes require that the doctor perform a deliberate act to cause fetal demise after delivery to an anatomical landmark, the Federal Act explicitly requires that this act be distinct from completing delivery. The Virginia Act lacks such a distinction. Compare Va. Code Ann. § 18.2-71.1(B) (requiring “any deliberate act”) with 18 U.S.C. § 1531(b)(1)(B) (requiring an “overt act, other than the completion of delivery”). As the Supreme Court emphasized, “[tjhis distinction matters because, unlike intact D & E, standard D & E does not involve a delivery followed by a fatal act.” Carhart II, 550 U.S. at 153, 127 S.Ct. 1610. The Federal Act’s requirement of an overt act distinct from completion of delivery excludes standard D & Es in which fetal demise results from disarticulation that occurs during the delivery. The Federal Act, in other words, requires an additional act such as compressing the fetal skull before liability can attach. In contrast, a doctor is liable under the Virginia Act for completing the evacuation of a fetus after it has emerged substantially intact if disarticulation (causing fetal demise) occurs during this process. See Carhart I, 530 U.S. at 939, 943-44, 120 S.Ct. 2597 (striking down abortion ban because it failed to distinguish between delivery and the act that terminated the fetus).
*192 The majority erroneously claims that the Virginia Act’s’ language, “deliberate act that is intended to kill a human infant who has been born alive,” Va.Code Ann. § 18.2-71.1(B), makes a distinction between an act intended to terminate the fetus and an act taken to complete delivery. Ante at 178-79. Specifically, the majority states that the use of the words “has been born alive” “indicates that the live birth ... must have taken place prior to the ‘deliberate act’ that kills the fetus.” Id. (emphasis in original). This statement ignores that a fetus that “has been born alive” is defined to include a fetus that has been delivered to an anatomical landmark. Va.Code Ann. § 18.2-71.1(0, (D). A fetus that has only emerged intact to a landmark has not yet been completely delivered. Any act taken thereafter to complete delivery that causes fetal demise is a deliberate act that violates the Virginia Act. For example, in the case of an intact breech presentation to the navel, that deliberate act would be the further pulling (or applying traction) to extract the fetus, which usually causes disarticulation and fetal demise. The majority’s assertion that “the act that results in the demise and the emergence to the anatomical lándmark cannot be one single action” is beside the point, because under the Virginia Act liability does not attach until after the fetus has emerged intact to a landmark. Nor is the majority’s reasoning saved by its reference to Va.Code § 18.2-71.1(B), which protects a doctor from liability' for “completing delivery of a living human infant and severing the umbilical cord of any infant who has been completely delivered.” For this provision to provide protection, the fetus must be living and intact at the completion of delivery. The protection has no bearing here as it does not protect a doctor when he fails to completely deliver a living infant because disarticulation has occurred before delivery is completed. See infra note 7. In short, the Virginia Act does not require that the deliberate (or overt) act be distinct from completing delivery for liability to attach.
3.
The absence of the intent-at-the-outset and distinct overt act requirements in the Virginia Act expand its reach substantially beyond that of the Federal Act. Every time a doctor intends at the beginning to perform a standard D & E, he runs the real risk of accidentally delivering an intact fetus to an anatomical landmark. As the Supreme Court recognizes, and the record in this case confirms, an accidental intact D & E occurs “in a small fraction of the overall number of D & E abortions.” Carhart II, 550 U.S. at 155,127 S.Ct. 1610. The Virginia Act imposes criminal liability in all such cases because a doctor faced with an accidental intact D & E must take steps to complete the abortion, which results in fetal demise. .The doctor commits a crime even though he intended at the outset to perform the legal, standard D & E procedure.
C.
The majority argues that the lack of an intent-at-the-outset requirement does, not render the Virginia Act unconstitutional because the Act “sufficiently cabins the narrow set of situations in which a doctor could incur criminal liability.” Ante at 177. This argument, however, ignores both the critical nature of the intent requirement and the lack of realistic options for avoiding criminal liability under the Virginia Act when a doctor is faced with an accidental intact delivery to an anatomical landmark.
In claiming that the Virginia Act is “plain as to how [ ] liability may be avoid *193 ed,” the majority quotes a passage from Carhart II in which the Supreme Court began its explanation as to why the Federal Act was not unconstitutionally vague. Id. at 177. The Court concluded that the Federal Act “provides doctors of ordinary intelligence a reasonable opportunity to know what is prohibited”: “[djoctors performing D & E will know that if they do not deliver a living fetus to an anatomical landmark they will not face criminal liability.” 550 U.S. at 149,127 S.Ct. 1610 (internal quotation mark omitted). The majority, however, has not included Carhart IFs very next paragraph, which follows below and explains how important the Federal Act’s intent requirement was to the Court’s conclusion:
This conclusion is buttressed by the intent that must be proved to impose liability. The Court has made clear that scienter requirements alleviate vagueness concerns. The Act requires the doctor deliberately to have delivered the fetus to an anatomical landmark. Because a doctor performing a D & E will not face criminal liability if he or she delivers a fetus beyond the prohibited point by mistake, the Act cannot be described as a trap for those who act in good faith.
Carhart II, 550 U.S. at 149-50, 127 S.Ct. 1610 (internal quotation marks and citations omitted). Carhart II thus makes clear that an intent-at-the-outset requirement was crucial to ensure that a doctor setting out to perform a constitutionally protected standard D & E would not face criminal punishment.
The majority claims that even without the initial intent requirement, the Virginia Act “makes clear to the doctor the permissible avenues for avoiding criminal liability” when “the fetus accidentally emerges intact to an anatomical landmark but is not completely expelled.” Ante at 177-78. The majority refers to these avenues as “affirmative defenses.” Id. at 169, 176-77, 177-78. As it must, the majority addresses the breech presentation when the fetal head is lodged in the cervix. As the Supreme Court recognized, this is “the usual intact D & E,” 550 U.S. at 138, 127 S.Ct. 1610, with the trunk extracted “past the anatomical landmark,” id. at 151, 127 S.Ct. 1610. In this situation, the majority says, the mother’s life is at risk, which allows a doctor to invoke the Virginia Act’s life exception, Va.Code § 18.2—71.1(E), and “complete the D & E procedure ... to save the mother’s life.” Ante at 177-78. Completion of the intact D & E would be permitted, notwithstanding the life exception’s requirement that the doctor “take[ ] every medically reasonable step, consistent [with the] procedure [necessary to prevent the woman’s death], to preserve the life and health of the infant.” Va.Code Ann. § 18.2-71.1(E). In any event, to complete the intact D & E, it would be necessary for the doctor to compress the fetal skull, which would be permissible to save the woman’s life. But applying the life exception in this manner would render the Virginia Act largely meaningless by permitting the very procedure the Act was meant to prohibit: an intact D & E when, after an intact delivery to the navel, the doctor must compress the fetal skull to remove the fetus. Under the majority’s interpretation, because the Act’s prohibition against partial birth infanticide does not apply until after delivery to an anatomical landmark, a doctor would be allowed to deliver (intentionally or unintentionally) a fetus until its skull becomes lodged; at this point both the Act’s prohibition and its life exception would apply; and the life exception would immediately cancel out the Act’s prohibition, allowing the doctor to deliberately collapse the skull to com *194 píete the abortion. This simply cannot be the purpose of the life exception.[6]
The majority also states that “where the mother’s life is not in danger and the fetus has been partially expelled to an anatomical landmark, the [Virginia Act] clearly prohibits the doctor from completing the abortion by taking a deliberate act to kill the fetus.” Ante at 178. Here, the majority is referring to the situation when the fetus is partially extracted to a landmark, but the head is not lodged. In that instance, according to the majority, the doctor’s only option is “to attempt to safely complete delivery of the fetus.” Id. at 178. Notwithstanding the majority’s apparent suggestion to the contrary, only a live, intact delivery will prevent criminal liability.[7] Again, the Virginia Act, unlike the Federal Act, lacks the requirement of a distinct overt act that is something other than an act taken to complete delivery. When a doctor is faced with a fetus partially emerged to a landmark (without the head being lodged), he must perform the deliberate act of continuing to apply traction in order to remove the fetus. As the record establishes, this traction almost always results in disarticulation and fetal demise. Of course, criminal intent to cause a result may be inferred if a person “knows that that result is practically certain to follow from his conduct.” 1 W. LaFave, Substantive Criminal Law § 5(a) (2d ed.2003). Here, the doctor knows that his deliberate act of continuing to apply traction is practically certain to result in the termination of the fetus, which means that he has committed a “deliberate act ... intended to kill the infant” or fetus, in violation of the Virginia Act.[8]
Finally, the majority observes that in the circumstance “where a standard D & E results in a full, intact birth”—a very rare circumstance—the “doctor will incur *195 liability [under the Virginia Act] only if [he] performs any deliberate act ‘intended to kill’ the fetus that has just been completely expelled.” Ante at 180. This observation is not relevant to this case because Dr. Fitzhugh does not contend that he would have to commit an overt act in the very rare situation in which the fetus is completely delivered intact.
The majority’s analysis offers no realistic options for the doctor who would wish to continue performing legal, standard D & E abortions. That doctor will not be assured by the majority’s implausible assertion that he has an “affirmative defense to any criminal liability.” See ante at 177-78. Nor will he have any confidence that the Supreme Court of Virginia would agree with the majority’s “affirmative defense” analysis. That doctor will stop performing standard D & Es altogether.
D.
Because a doctor violates the Virginia Act when a standard D & E results in an accidental (partial) intact delivery and he must then perform an act causing fetal demise, he subjects himself to the risk of criminal liability at the outset of every standard D & E. The only way for a doctor to avoid this risk is to refrain from performing all standard D & E procedures. As a result, the Virginia Act imposes an undue burden upon a woman’s right to choose a pre-viability second trimester abortion. The Act is therefore unconstitutional.
IV.
Because an accidental intact D & E occurs in only “a small fraction of the overall number of D & E abortions,” Car-hart II at 156, 127 S.Ct. 1610, the majority concludes that a facial challenge is not appropriate. The majority, however, focuses on the wrong fraction in reaching this conclusion. The majority considers how often a standard D & E becomes an accidental intact D & E, when the critical question is how often (and whether) the Virginia Act imposes a burden on a woman’s ability to obtain a (pre-viability) standard D & E abortion. It is the latter inquiry, not the former, that should ultimately guide our decision as to whether a facial challenge can be sustained. The record here establishes that the Virginia Act threatens criminal liability—and thus imposes a burden—in every case that calls for a standard D & E. That is 100 percent of those cases, more than sufficient to sustain a facial challenge.
In arguing that a facial challenge cannot be “successfully mount[ed]” in this case, the majority begins by noting the Supreme Court’s oft-stated “preference for avoiding facial challenges.” Ante at 172-73. Notwithstanding the Court’s professed preference, the Court has allowed facial challenges more often “than generally recognized.” Richard H. Fallon, Jr., As-Applied and Facial Challenges and Third-Party Standing, 113 Harv. L.Rev. 1321, 1322 (2000) (citing Michael C. Dorf, Facial Challenges to State and Federal Statutes (Facial Challenges), 46 Stan. L.Rev. 235 (1994)). Indeed, it is well established that a facial challenge alleging overbreadth is an appropriate vehicle for seeking the invalidation of a statute regulating abortion. See Sabri v. United States, 541 U.S. 600, 609-10, 124 S.Ct. 1941, 158 L.Ed.2d 891 (2004) (citing Carhart I, 530 U.S. at 938-946, 120 S.Ct. 2597).
As recently as 2007 in Carhart II the Court entertained a facial (overbreadth) challenge to the Federal Act prohibiting partial birth abortion. After conducting a careful analysis of the text of the Federal Act to determine its “operation and effect,” the Court concluded that the statute did not impose an undue burden through over- *196 breadth because it did not “prohibit the vast majority of D & E abortions.” Car-hart II, 550 U.S. at 156, 127 S.Ct. 1610. The Court did require the use of an as-applied challenge in the limited context of an attack on the Federal Act’s lack of a health exception, concluding that “the nature of the medical risk can be better quantified and balanced” in an as-applied challenge. Id. at 167-68, 127 S.Ct. 1610. Carhart II, however, did not question the general validity of facial challenges to abortion statutes.
There is a compelling reason for allowing facial challenges in the abortion context. See Sabri, 541 U.S. at 609-10, 124 S.Ct. 1941 (recognizing the validity of facial attacks in a “few settings,” including abortion, based “on the strength of specific reasons weighty enough to overcome [the Court’s] well-founded reticence” to entertain such attacks). There is simply insufficient time in an individual case to pose an as-applied challenge to a statute regulating abortion. For example, Dr. Fitzhugh only performs D & E abortions during six weeks of a pregnancy, from fourteen weeks through twenty weeks. That narrow period would not realistically afford a pregnant woman or Dr. Fitzhugh enough time to obtain a judgment that an abortion regulation is invalid as applied. Mandatory case-by-case challenges, as the majority advocates, would require a doctor to violate the Virginia Act and then raise the constitutional defense during his criminal prosecution. As I have already emphasized, rather than take such a perilous course, a doctor would surely stop performing D & E abortions altogether. “Thus, requiring that challenges to an overbroad statute prohibiting abortion proceed on a case-by-case [or as-applied] basis will chill a woman’s right to choose an abortion.” Dorf, Facial Challenges, 45 Stan. L.Rev. at 271.
The majority appears ultimately to recognize that facial challenges are valid in the abortion context, but says there is “uncertainty regarding the appropriate criteria for entertaining facial challenges” in such cases. Ante at 174. The majority advances three alternatives: (1) the “no set of circumstances” standard, see United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (a facial challenge “must establish that no set of circumstances exists under which the Act would be valid”); (2) the “plainly legitimate sweep” standard, see Washington State Grange v. Washington State Republican Party, — U.S.-, 128 S.Ct. 1184, 1190, 170 L.Ed.2d 151 (2008) (“a facial challenge must fail where the statute has a plainly legitimate sweep”) (quotation marks omitted); and (3) the “large fraction of [relevant] cases” standard, see Casey, 505 U.S. at 895, 112 S.Ct. 2791 (facial challenge sustained because “in a large fraction of the cases in which [the statute] is relevant, it will operate as a substantial obstacle to a woman’s choice to undergo an abortion”).
The “no set of circumstances” and the “plainly legitimate sweep” standards are not justifiable options because the Supreme Court has not adopted either standard in the abortion context. In Casey (1992) the Court used the “large fraction of [relevant] cases” standard. 505 U.S. at 895, 112 S.Ct. 2791. Later, in Carhart I (2002) the Court did not refer to either the “no set of circumstances” or “plainly legitimate sweep” standard in holding an abortion ban statute unconstitutional on its face because it imposed an undue burden on a woman’s ability to choose a standard D & E abortion. Carhart I, 530 U.S. at 945-46, 120 S.Ct. 2597. And, most recently, the Court in Carhart II (2007) declined specifically to endorse the “no set of circumstances” standard, stating that the debate about the proper burden need not be re *197 solved. 550 U.S. at 167, 127 S.Ct. 1610. The Carhart II Court went on to apply Casey’s standard, holding that the plaintiffs were unable to “demonstrate! ] that the [Federal] Act would be unconstitutional in a large fraction of relevant cases. ” Id. at 167-68, 127 S.Ct. 1610 (citing Casey, 505 U.S. at 895, 112 S.Ct. 2791) (emphasis added).
Here, the majority contends that facial invalidation of the Virginia Act is not appropriate under any standard, not “even under the more relaxed ‘large fraction of the cases’ test applied in Casey. ” Ante at 174; see ante at 175-76. The majority ultimately uses the Casey standard, but goes seriously astray in applying that standard.
The majority states that it is a “rare circumstance” in Dr. Fitzhugh’s practice for a fetus in breech position to emerge intact to the navel. Ante at 175. This pronouncement ignores the fundamental question: how often in Dr. Fitzhugh’s practice would the Virginia Act burden the right of a woman to choose a (pre-viability) D & E abortion. Dr. Fitzhugh performs about 225 pre-viability D & E abortions each year. One, two, or three times a year Dr. Fitzhugh is faced with the situation when the fetus (in breech position) accidentally emerges intact with the head lodged in the cervix. In this circumstance, the record establishes that Dr. Fitzhugh must compress the fetal skull, which terminates the fetus, in violation of the Virginia Act. In addition, Dr. Fitzhugh encounters, in what would also be a small fraction of cases, the circumstance when the fetus (again in breech position) emerges intact to the navel before the neck becomes lodged in the cervix. To complete removal, he must continue to apply traction that typically results in disarticulation; he lacks a way to assure a live, intact delivery and avoid liability under the Virginia Act.
The record therefore establishes that Dr. Fitzhugh, if he continued to perform D & E abortions, would commit a felony under the Virginia Act in the range of one to three times a year. To avoid this real and substantial risk, Dr. Fitzhugh, or any reasonable doctor, would have to stop performing D & Es altogether. Again, the majority has not asked how often the Virginia Act will deter a doctor, such as Dr. Fitzhugh, from performing a standard D & E, the most common and safest abortion method during the second trimester of pregnancy. The answer is that a doctor would be at risk—and deterred—in every case that calls for a standard D & E. This result is more than sufficient to meet Casey’s “large fraction of relevant cases” standard, making a facial challenge appropriate.
V.
At the very least Dr. Fitzhugh’s as-applied challenge should be allowed and determined in his favor. Notwithstanding the majority’s assertion to the contrary, see ante at 180, Dr. Fitzhugh has presented a thoroughly concrete set of facts establishing that the Virginia Act will operate unconstitutionally as applied to his individual D & E abortion practice. Dr. Fitzhugh has testified about the number of standard D & E abortions he performs each year. He has explained how in a small fraction of those cases the fetus accidentally emerges up to or past an anatomical landmark and he must take action that results in the demise of the fetus—action that violates the Virginia Act. This evidence will be no different if Dr. Fitzhugh is forced to file another lawsuit. On the current record Dr. Fitzhugh has established that if the Virginia Act goes into effect, his only options will be either to stop performing standard D & Es altogether or to continue performing the pro *198 cedure and expose himself to career-ending criminal liability. Because our system does not put Dr. Fitzhugh to such a choice, see Steffel v. Thompson, 415 U.S. 452, 475, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), his as-applied challenge is ripe today. And that challenge should be sustained.
VI.
Judge Wilkinson writes a concurrence to record his obvious disagreement with 36 years of Supreme Court jurisprudence on the issue of abortion. In doing so, he goes beyond our warrant as an inferior court, which is to apply the Constitution as the Supreme Court has interpreted it, and exceeds our role as a court of law, which is to adjudicate legal, not ethical, questions.
Moreover, the moral dimensions of the abortion debate are significantly more complex than Judge Wilkinson acknowledges. He fails, for example, to fully recognize that a woman’s decision whether to bear a child involves “the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy.” Casey, 505 U.S. at 851, 112 S.Ct. 2791. The freedom to make that decision ensures that a woman has control over her body and the conditions of her life, including her ability to protect and nurture her family, to overcome financial hardships, to leave abusive relationships, and to make critical decisions about her own health and well being. As the Supreme Court recognized in Casey, “[m]en and women of good conscience can disagree, and we suppose some always shall disagree, about the profound moral and spiritual implications of terminating a pregnancy, even in its earliest stage.” 505 U.S. at 850, 112 S.Ct. 2791. In the face of that disagreement, however, the Supreme Court went on to confirm a woman’s constitutional right. Our duty here is to measure the Virginia Act against that precedent, not revisit the debate.
VII.
I would affirm the district court’s judgment declaring the Virginia Act unconstitutional on the ground that it imposes an undue burden on a woman’s right to choose a pre-viability second trimester abortion.
Judge MOTZ, Judge TRAXLER, Judge KING, and Judge GREGORY join in this dissent.

. This dissent incorporates some of the rationale contained in the now vacated panel opinion, Richmond Med. Ctr. for Women v. Herring, 527 F.3d 128 (4th Cir.2008).

. I understand "outside the body of the moth-ed’ to mean beyond the vaginal opening.

. The Virginia Act uses the word “dismemberment” rather than “disarticulation.”

. The majority fails in its effort to discredit Dr. Fitzhugh when it notes that he had no *187 specific recollection of the last instance in which this “scenario occurr[ed]” in his practice. Ante at 170. When asked whether it “[w]as within the past year,” Dr. Fitzhugh answered, "Oh, yes,” adding that he simply could not recall the exact times. He was confident about the ten percent occurrence rate.

. The majority's argument that the Virginia Act’s intent requirement can be read "to require purpose, not mere knowledge” will not protect a doctor faced with accidental delivery to an anatomical landmark. See infra at 194 n. 8.

. Despite the majority's argument, the occurrence rate of accidental intact D & Es has no bearing on the above analysis. See ante at 175 n. 4 (stating that an accidental intact breech delivery with the fetal head lodged in the cervix is "rare”). The point is that the majority, in an attempt to save the Virginia Act by carving out a defense for the accidental intact D & E, has interpreted the life exception in a way that would also exempt the typical intentional intact D & E. This construction drains the Act of any real meaning.

. In seeking to support its suggestion that attempting "to safely complete delivery” will absolve the doctor, the majority cites an exception in § 18.2-71.1(B) of the Virginia Act. Ante at 178 n. 6. To repeat, this exception provides that partial birth infanticide does not include "completing delivery of a living human intact and severing the umbilical cord of any infant who has been completely delivered." Va.Code Ann. § 18.2-71.1(B). This exception does not aid the doctor facing an accidental intact delivery to an anatomical landmark because that doctor has virtually no chance of completing a live delivery of the fetus. Moreover, the umbilical cord often disarticulates in the process of extracting a previability fetus. The exception is therefore designed for another purpose, that is, to ensure that doctors will not face liability for committing the deliberate act of severing the umbilical cord after completely delivering a living infant. The exception thus protects obstetricians who deliver living infants, not doctors who perform abortions. See Richmond Med. Ctr., 527 F.3d at 141-42 (vacated) (explaining the limited coverage of the exception).

. The majority's attempt to "read the Virginia Act intent requirement to require purpose, not mere knowledge, that a specific act ... will result in fetal demise” affords a doctor no additional protection in a criminal trial. Ante at 176-77; see also ante at 178 n. 6. The Virginia Act makes it a felony to "knowingly perform!]” "any deliberate act that ... is intended to kill” a partially extracted fetus. Va.Code Ann. § 18.2-71.1(A), (B) (emphasis added). The Act’s intent language will allow a Commonwealth of Virginia trial court to instruct a jury that "it is permissible to infer that every person intends the natural and probable consequences of his or her acts.” Schmitt v. Commonwealth, 262 Va. 127, 547 S.E.2d 186, 198 (2001) (emphasis added).